1
2
3
4
5
6
7
8
9

**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| R.P., by and through his guardian ad litem, GEMMA PADILLA, | Case No. 1:15-cv-00449-SMS |
| Plaintiff, | ORDER REVERSING AND REMANDING AGENCY'S DENIAL OF BENEFITS |
| v. | |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | |
| Defendant. | |

Plaintiff, a minor seeks review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for supplemental security income ("SSI") under Title XVI of the Social Security Act (42 U.S.C. § 301 *et seq.*) ("the Act").  The matter is before the Court on the parties' cross-briefs,[1] which were submitted without oral argument to the Magistrate Judge.  Following a review of the record and applicable law, the Court reverses the Commissioner's determination to deny benefits and remands this action to the Administrative Law Judge ("ALJ").

---

[1]  Under the parties' stipulation, filed July 20, 2016 and approved by the Court, the Commissioner's opposition brief was due August 19, 2016.  Docs. 28-29.  When two months passed and no opposition brief had been filed, the Court issued an order on October 20, 2016, directing the Commissioner to file her brief no later than October 28, 2016, and provided Plaintiff fifteen (15) days thereafter to file a reply brief.  Doc. 29.  *See Link v. Wabash R. Co.*, 370 U.S. 626, 630–31 (1962) (noting district courts are vested with the power "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases") (footnote omitted).  The Commissioner filed her opposition brief on October 28, 2016 and Plaintiff filed a reply brief on November 14, 2016.  Docs. 30- 31.

I.      PROCEDURAL HISTORY AND FACTUAL BACKGROUND[2]

A. *Procedural History*

On July 22, 2011, R.P. applied for SSI on behalf of R.P., born July 5, 1999.  The Commissioner denied his claim on December 1, 2011, and upon reconsideration on August 8, 2012. AR 94, 117, 218.  At a hearing on September 26, 2013, before ALJ Sharon L. Madsen, R.P. appeared with his mother, Gemma Padilla, and counsel.   AR 45.  Thereafter, on November 27, 2013, the ALJ issued a written decision finding R.P. had not been disabled under the Act.  AR 39. On December 29, 2014, the Appeals Council denied review of the ALJ's decision, which thus became the Commissioner's final decision and from which R.P. filed his complaint.[3]  AR 7, Doc. 1.

B. *Factual Background*

1. <u>Written Testimony</u>

As stated in the first disability report completed in August 2011, R.P.'s disabling conditions included mental retardation, autism, and asthma.  AR 248.  He was, at the time, in the seventh grade and enrolled in special education classes.  AR 250-251.  Also in August 2011, Ms. Padilla completed a Child Function Report and a Child Asthma Questionnaire on behalf of R.P.  Functionally, R.P.:

> (1) had problems talking clearly;
> (2) could not use sentences with the words *because*, *what if* or *should have been*;
> (3) could not answer or make phone calls or deliver phone messages;
> (4) did not understand money;
> (5) could not swim, ride a bike or jump rope;
> (6) could not take care of personal hygiene, wash and put away clothes, cook, and help around the house; and
> (7) could not use public transportation on his own.

His asthma attacks were triggered by allergies and occurred when "he gets sick."  He had never been admitted to the emergency room because of an asthma attack, but takes daily medication to control them. AR 235-242, 256-257.  In the second disability report completed in February 2012, R.P. reported tumors were found in R.P.'s testicles, and he suffered back pain and migraines.  He

---

[2]  The relevant facts herein are taken from the Administrative Record ("AR").
[3]  Upon request, the Appeals Council extended the time to file the complaint until June 20, 2015. Plaintiff filed her complaint on March 23, 2015.  AR 1, Doc. 1.

struggled with personal care and was dependent on his mother.  He also struggled with at school and had trouble sleeping.  AR 269, 272.

    2.  <u>Medical Evidence</u>

The administrative record shows R.P. was enrolled in special education classes since September 2003.  He remained under an Individualized Education Program ("IEP") and was evaluated every three years.  Additionally, R.P.'s progress was reviewed at meetings annually or when needed.

Aside from his teachers, numerous physicians evaluated R.P.  In May 2004, Nancy N. Doi, Psy. D., at the Sullivan Center for Children conducted a psychological evaluation of R.P.  The evaluation was part of an assessment by the Fresno Central Valley Regional Center ("Fresno CVRC") to determine his eligibility for services at school.  AR 409.  Because of R.P.'s lack of cooperation, "an actual IQ score could not be gained[.]"  AR 412.  Dr. Doi found R.P. to be highly active and opined that it was unclear whether "his attempts to avoid other people, his unusual socialization, [and] his poor attention and high levels of activity [were] associated with autism or with very low levels of communication capabilities."  His functioning was "above that of a twenty-four month old child, yet below that of a child who is thirty months of age."  "The Autism Rating Scale place[d] his likelihood of being autistic in the average range" compared to those with autism and "[h]is adaptive behavior scales place[d] him in the moderate level of deficit compared to other children his age."  AR 414.  She recommended that R.P. continue with speech and language therapy, obtain an evaluation of his hyperactivity and aggressive behaviors, and consider the possibility of in-home modification to help Ms. Padilla "better structure the environment and contain [R.P.'s] tantrums and outbursts."  AR 415.

In June 2005, Michael S. Kesselman, Ph.D., evaluated R.P. at the request of Fresno CVRC.  AR 404.  Dr. Kesselman assigned R.P. an IQ score of 72 and stated "this score probably reflects mild retardation rather than borderline functioning."  AR 406.  Dr. Kesselman recommended R.P.

continue with speech therapy and opined "he may not be retarded as he has progressed so much since previous evaluations," and "with the progress he has made in his verbalization and social interaction that a diagnosis of Autism and Pervasive Developmental Disorder would clearly be ruled out." AR 407.  Nonetheless, Dr. Kesselman believed R.P. was "appropriately placed in a special education program."  AR 408.

In January 2010, Richard Engeln, Ph.D., evaluated R.P. at the request of the Department of Social Services ("DSS").  AR 458.  Dr. Engeln assigned R.P. a full scale IQ score of 73 and found "no evidence of any mental or emotional illness."  His "general presentation did not suggest autism per se, but did reflect developmental language disorder . . . and attention deficit qualities, with much off task behavior and distractibility."  Dr. Engeln diagnosed R.P. with attention-deficit/hyperactivity disorder, some oppositional behavior disorder, developmental language disorder, and moderate academic delay.  His "verbal, cognitive and social skills" were appropriate for special day class placement.  AR 461-462.

In March 2010, a child psychiatrist, Joan Trachtenberg, M.D., completed a childhood disability evaluation form of R.P.  Therein, Dr. Trachtenberg indicated R.P. had an impairment or combination of impairments which were severe, but did not meet, medically equal or functionally equal the listings.  Specifically, she noted less than marked impairments in the following domains: acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for oneself.  AR 465.

In October 2011, another psychological evaluation was conducted at the request of DSS, this time by Steven C. Swanson, Ph. D., who reviewed the evaluations of Drs. Engeln and Kesselman, a May 2009 Multidisciplinary Evaluation Report, and a May 2009 Speech and Language Assessment.  AR 533-534.  Dr. Swanson assigned R.P. a full scale IQ score of 72.  Dr. Swanson  concluded that R.P. "can be expected to perform academically at a level that is considerably lower than same-aged peers."  But his "effort was not fully optimal; consequently, this may be a low reflection of his true

intelligence."  AR 536.  Dr. Swanson diagnosed R.P. with borderline intellectual functioning and

asthma, and assigned him a GAF score of 65.[4]  AR 538.  According to Dr. Swanson, R.P.:

> score[d] in the non-autistic range . . . and [did] not present as autistic.
> [His] mental and emotional functioning falls within normal limits.  He
> appears to have the ability to communicate by understanding,
> initiating, and using language in an age-appropriate manner.   He
> appears to have the ability to socially integrate with peers and adults in
> a mostly age-appropriate fashion.   He seems to have the ability to
> engage in and sustain an activity at a pace that is mostly appropriate
> for his age.

AR 539.

The latest psychological evaluation occurred in September 2013 at the Center of Autism and

Related Studies, and was conducted by a psychology practicum student, Katrina Cajucom, M.S.,

under the supervision of a licensed psychologist, Santino LoVullo, Ph.D.  At the time, R.P. was

fourteen years old and homeschooled through California Virtual Academies ("CAVA").  AR 819.

The relevant assessments of R.P. were: (1) autism, (2) very low range cognitive abilities with a full

IQ score of 65, (3) severe deficit with regard to language ability and expressive language skills, and

(4) well below the expected level to slightly below the expected level with regard to attention and

executive functioning abilities.  Based on his symptoms, R.P.'s diagnosis included autism spectrum

disorder with accompanying intellectual and language impairments.  Among the recommendations

were that R.P. receive Applied Behavior Analysis therapy, be placed "in a school setting rather than

a home-based program in order to increase opportunities to socialize," and "expand [his] repertoire

of social leisure activities."  AR 837-839, 841.

In October 2012, R.P. underwent a cognitive skills assessment.  He was thirteen years old at

---

[4]  "A GAF score is a rough estimate of an individual's psychological, social, and occupational
functioning used to reflect the individual's need for treatment."  *Garrison v. Colvin*, 759 F.3d 995,
1003 n.4 (9th Cir. 2014) (quotations and citation omitted).  "A GAF score of 61–70 reflects mild
symptoms or 'some difficulty' in those areas, but the individual 'generally function[s] pretty well.' "
*Sims v. Barnhart*, 309 F.3d 424, 427 (7th Cir. 2002) (quoting American Psychiatric Association,
*Diagnostic & Statistical Manual of Mental Disorders* 30 (4th ed. 1994)).

the time.  Results show significant problems with the following areas of learning: attention, visual processing, auditory processing, logic and reasoning, and work or academic performance.  He scored in the zero to twenty percentile in cognitive skills.  The results were provided by Renee Bautista Guill, whose credentials do not appear in the administrative record.  AR 314-317.

Recent school records include a Multi-Disciplinary Evaluation Report -Triennial Assessment from April 2012 ("Multi-Disciplinary Report"), a Three-Year Evaluation-Teacher Report also from April 2012, reports from May 2012 and December 2012, and annual Student Reports under California's Standardized testing and Reporting ("STAR") Program from Spring 2007 to Spring 2013.  AR 294, 319-323, 332-338,  558, 782-797.  Conducted by school psychologist Cheryl Gibson, Ed.S., B.I.C.M., the Multi-Disciplinary Report show R.P. received a full scale IQ score of 88 under the Universal Nonverbal Intelligence test ("UNIT").  AR 789.

With regard to his physical health, R.P. was evaluated by the staff and physicians at United Health Centers ("United Health"); the Children's Hospital in Central California ("Children's Hospital"); and the Baz Allergy, Asthma & Sinus Center ("Baz Center").  Records show he received services at these facilities intermittently from July 2010 to October 2012 at United Health; from October 2010 to February 2013 at the Children's Hospital; and from June 2011 to June 2012 at the Baz Center.  Elida Gonzalez, F.N.P., at United Health assessed R.P. with questionable asthma and autism, among other.  AR 478-502, 625-640.  At the Children's Hospital, he underwent scrotal ultrasounds, an electroencephalogram, and a cardiology consultation with generally unremarkable results.  AR 543-552, 799-813.  And at the Baz Center, attending physicians diagnosed R.P. with multiple conditions including asthma and autism.  AR 510-528, 648-686.

A number of State agency medical consultants reviewed R.P.'s file in the disability determination process.  They included C. De la Rosa, M.D.; M. Vea, M.D.; H. Biala, M.D.; and J. Mitchell, M.D.  AR 84-93, 106-113.  Dr. De la Rosa was associated with "Pediatrics" and Dr. Vea with "Psychiatry."  No association or specialization is indicated with regard to Drs. Biala and

Mitchell.  Drs. De la Rosa and Vea reviewed R.P.'s file in November 2011 before the initial

determination to deny benefits and had before them records from: R.P.'s middle school; the Baz

Allergy, Asthma & Sinus Center; Fresno CVRC; United Health; and Drs. Engeln and Swanson.

They also had before them R.P.'s August 2011 Child Asthma Questionnaire and Child Function

Report.  Drs. Biala and Mitchell reviewed R.P.'s file in August 2012, days before reconsideration

determination to deny benefits.  They had before them the records viewed by Drs. De la Rosa and

Vea, plus records from Sanger USD and the Children's Hospital.

     3.  <u>Hearing before ALJ</u>

     Testifying before ALJ Madsen, R.P. stated he was the fourth of five children and needed help

with personal care.  He did not know his grade in school and what school he attended, but stated he

had independent study at home.  He participated in his class via the computer and understood the

teacher.  He played soccer, baseball, and basketball.  He enjoyed video games, going on the internet,

listening to music, and watching television, particularly cartoons but not comedies.  He was learning

to play golf and the piano.  He played with his siblings and gets into arguments with them.  He also

had friends from school.  For the most part, R.P. responded to the ALJ's questions with, "I don't

know."  AR 49-59.

     Ms. Padilla also testified.  She stated R.P. transitioned to CAVA shortly after he started

eighth grade in the Sanger USD.  Though he received As and Bs while in enrolled in classes at

Sanger USD, he did "like second, third grade work" and had an IEP for all of his classes.  Under

CAVA, schooling is completed online with teacher meetings occurring every quarter.  The IEP,

though different, continued with R.P.'s transition to CAVA, and he had classes with a special

education teacher three times a week.  Under CAVA, R.P. received grades of Cs and Ds.  Either Ms.

Padilla or R.P.'s siblings helped him with all of his homework.

     Ms. Padilla arranged parents play dates for R.P. once or twice a month, and about once a

week R.P. plays with a male friend.  With help, R.P. did his chores and could put on his clothes,

1
2
3
4
5
6
7

though he did not know how to handle buttons or zippers.  He could spend all day playing video games .  He was not, at the time, taking any medication for behavioral problems or seeing a therapist.  He was, however, taking medication for his asthma.  He continued to play basketball, learn the piano and golf, and recently started doing archery.  He could get a snack for himself but would not ask for food unless offered.  He enjoyed cooking with Ms. Padilla and would go shopping with her, but sometimes threw tantrums in the store.  AR 62-80.

    4.  ALJ's Decision

8
9
10

In determining child disability, an ALJ engages in an analysis different from the usual five-step sequential process.  Instead, the inquiry is as follows:

11
12
13
14
15
16
17
18
19

> If you are doing substantial gainful activity, we will determine that you are not disabled and not review your claim further.  If you are not doing substantial gainful activity, we will consider your physical or mental impairment(s) first to see if you have an impairment or combination of impairments that is severe.  If your impairment(s) is not severe, we will determine that you are not disabled and not review your claim further.  If your impairment(s) is severe, we will review your claim further to see if you have an impairment(s) that meets, medically equals, or functionally equals the listings.  If you have such an impairment(s), and it meets the duration requirement, we will find that you are disabled. If you do not have such an impairment(s), or if it does not meet the duration requirement, we will find that you are not disabled.

20
21
22
23
24
25
26
27
28

20 C.F.R. § 416.924(a).  The phrase "functionally equal the listings" means the "impairment(s) must be of listing-level severity; i.e., it must result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain[.]"  *Id*. at § 416.926a(a).  These domains include: "(i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating with others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and, (vi) Health and physical well-being."  *Id*. at § 416.926a(b)(1); *see Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003).  The duration requirement is met where the "marked and severe functional limitations . . . can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C).

Here, the ALJ found R.P.: (1) had not engaged in substantial gainful activity since the application date of July 22, 2011; (2) had severe impairments of academic delay, developmental language delay, autism spectrum disorder, and asthma; but (3) did not have an impairment or combination of impairments which met, medically equaled, or functionally equaled the severity of a listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1, Parts A or B.  With regard to functional equivalence, the ALJ found R.P.: (1) had less than marked limitation in acquiring and using information; (2) had less than marked limitation in attending and completing tasks; (3) had less than marked limitation in interacting and relating with others; (4) had less than marked limitation in moving about and manipulating objects; (5) had less than marked limitation in the ability to care for himself; and (6) had marked limitation in health and physical well-being.  Consequently, the ALJ concluded R.P. was not disabled as defined under the Act since the application date of July 22, 2011.  AR 28-39.

II.    DISCUSSION

   A.  *Legal Standards*

   This Court reviews the Commissioner's final decision to determine if the findings are supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 401 (1971)), but "less than a preponderance." *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401. "If the evidence can reasonably support either affirming or reversing a decision, we may not substitute our judgment for that of the Commissioner.  However, we must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence."  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (internal citation and quotations omitted).  "If the evidence can support either outcome, the Commissioner's decision

must be upheld." *Benton v. Barnhart*, 331 F.3d 1030, 1035 (9th Cir. 2003); *see* 42 U.S.C. § 405(g) (2010). But even if supported by substantial evidence, a decision may be set aside for legal error. *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009).

Moreover, an ALJ's error is harmless "when it was clear from the record that [the] error was inconsequential to the ultimate nondisability determination." *Robbins v. Soc. Sec. Admin.* 466 F.3d 880, 885 (9th Cir. 2006).

B. *Analysis*

1. <u>Medical Expert Evaluation</u>

First, R.P. contends the ALJ committed legal error by not having a pediatrician or other appropriate specialist evaluate the entire record as required under 42 U.S.C. § 1382c(a)(3)(I). The Commissioner asserts R.P.'s contention is meritless because qualified physicians reviewed the medical and school records covering the relevant period.

Section 1382c states in relevant part:

> In making any determination under this subchapter with respect to the disability of an individual who has not attained the age of 18 years and to whom section 421(h) of this title does not apply, the Commissioner of Social Security shall make reasonable efforts to ensure that a qualified pediatrician or other individual who specializes in a field of medicine appropriate to the disability of the individual (as determined by the Commissioner of Social Security) evaluates the case of such individual.

42 U.S.C. § 1382c(a)(3)(I). The Ninth Circuit interpreted this "to mean that the ALJ is required to make a reasonable effort to obtain a case evaluation, based on the record in its entirety, from a pediatrician or other appropriate specialist, rather than simply constructing his own case evaluation from the evidence in the record." *Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1014 (9th Cir. 2003) (footnoted omitted).

Recognizing that *Howard* interpreted section 1382c(a)(3)(I) of the Act "more broadly" than

the SSA, the latter issued Acquiescence Ruling[5] 04-1(9) ("Ruling 04-1(9)"), which states in pertinent

part:

> This Ruling applies only to title XVI childhood disability cases in
> which the claimant resided in Alaska, Arizona, California, Guam,
> Hawaii, Idaho, Montana, Nevada, Northern Mariana Islands, Oregon
> or Washington at the time of the ALJ or Appeals Council decision.
> This Ruling applies only to the Administrative Law Judge and Appeal
> Council levels of the administrative review process.

> For cases that are subject to this Ruling, ALJs and AAJs (when the
> Appeals Council makes a decision) must make reasonable efforts to
> ensure that a qualified pediatrician or other individual who specializes
> in a field of medicine appropriate to the disability of the individual (as
> identified by the ALJ or AAJ) evaluates the case of the individual. To
> satisfy this requirement, the ALJ or AAJ may rely on case evaluation
> made by a State agency medical or psychological consultant that is
> already in the record, or the ALJ or AAJ may rely on the testimony of
> a medical expert. When the ALJ relies on the case evaluation made by
> a State agency medical or psychological consultant, the record must
> include the evidence of the qualifications of the State agency medical
> or psychological consultant. In any case, the ALJ or AAJ must ensure
> that the decision explains how the State agency medical or
> psychological consultant's evaluation was considered.

2004 WL 875081, at *22580(April 26, 2004) (citations omitted).

There can be no objection that Acquiescence Ruling 04-1(9) applies to this case. And

indeed, the administrative record shows that no "qualified pediatrician or other individual who

specializes" in the areas of childhood development evaluated R.P.'s case "in its entirety." *See* 42

U.S.C. § 1382c(a)(3)(I); *Howard ex rel. Wolff*, 341 F.3d at 1014. And while the ALJ relied on

evaluations by State agency medical and psychological consultants, they fall short of the

requirements of section 1382c(a)(3)(I), *Howard ex rel. Wolff*, and Acquiescence Ruling 04-1(9).

The Commissioner's assertion that evaluations by numerous examining and Stage agency

physicians sufficed to support the ALJ's findings is specious. With regard to Dr. Trachtenberg, her

evaluation of R.P. occurred in March 2010, well before his record was completed. She could not

---

[5] With some exceptions, Social Security Rulings and Acquiescence Rulings "are binding on all
components of the Social Security Administration." 20 C.F.R. § 402.35(b)(1)-(2).

have reviewed his school records, cognitive skills assessment, and psychological evaluations after 2010, and therefore did not evaluate his case in its entirety.  The same is true of Dr. Swanson, whose evaluation occurred in October 2011.  While Dr. Swanson reviewed parts of R.P.'s records—the evaluations of Drs. Engeln and Kesselman, a May 2009 Multi-Disciplinary Evaluation Report, and a May 2009 Speech and Language Assessment Report—they do not comprise the entirety of his case. Dr. Swanson's evaluation, like Dr. Trachtenberg's, unequivocally fell short.

        Similarly, with regard to the medical consultants, none evaluated R.P.'s entire case.  Drs. De la Rosa and Vea reviewed R.P.'s file in November 2011, but there are school records and reports, a cognitive skills assessment, and a psychological evaluation post-2011 which they did not review. And although Drs. Biala's and Mitchell's evaluations were the most comprehensive, occurring in August 2012 and covering more records than other medical consultants, they still did not view R.P.'s entire case.  Specifically, they did not review the October 2012 cognitive skills assessment and the September 2013 psychological evaluation, or the school records and reports after August 2012. Additionally, the requirement that "the record . . . include the evidence of [their] qualifications" is not met as there is no evidence that either is a "qualified pediatrician" or "specializes in a field of medicine appropriate" to the disabilities identified by the ALJ.  *See* Acquiescence Ruling 04-1(9). There is no evidence to indicate the ALJ made "reasonable efforts to ensure that a qualified pediatrician or other individual who specializes in a field of medicine appropriate to the disability" of R.P. evaluated his case "in its entirety."  Rather, it appears the medical consultants' evaluations were conducted as part of routine procedure before the initial and subsequent reconsideration disability determinations.

        Moreover, the Court is hard pressed to conclude that the error here "was inconsequential to the ultimate nondisability determination."  *See Robbins*, 466 F.3d at 885.  The medical records which Drs. Biala and Mitchell did not view do not support a finding of nondisability.  Specifically, the October 2012 cognitive skills assessment reflect significant problems in various areas of learning

and placed R.P.'s cognitive skills in the very low percentile.  The September 2013 psychological

evaluation show an assessment of autism with a full IQ score of 65, and severe deficit in language,

attention and functioning abilities.  Further, R.P.'s Spring 2013 STAR Student Report show a

decline in English-Language Arts and General Mathematics, as compared to those from Spring 2007

to 2012.  *See Jensen v. Colvin*, 2015 WL 1275307, at *9 (E.D. Cal. Mar. 19, 2015) (No. 2:13-CV-

01822-AC) (explaining that "although the ALJ's failure to include evidence of the agency

physician's qualifications may have been harmless, his failure to obtain a comprehensive case

evaluation was not" where "many of the reports were generated after the case evaluations took

place").[6]

The ALJ's failure to comply with section 1382c(a)(3)(I), *Howard ex rel. Wolff*, and

Acquiescence Ruling 04-1(9) therefore resulted in a decision which is not free of legal error.  And

under the circumstances, such error is not harmless.

### 2.  IQ Scores

Next, R.P. contends the ALJ erred in failing to find that the impairment or combination

thereof met or equaled listing 112.05D.  He asserts the full scale IQ score of 65 was the only valid

score and the ALJ committed legal error in discounting it.  The Commissioner counters the ALJ

reasonably concluded the score of 65 was incompatible with R.P.'s behavior and therefore properly

found 72-73 to be a more accurate reflection of his functioning abilities.

The Court notes the ALJ did not expressly consider listing 112.05D.  After concluding R.P.'s

impairment or combination did not meet or medically equal the severity of a listed impairment, the

ALJ simply stated, "[s]tate agency medical consultants and the psychological medical consultant,

Dr. Swanson, Ph.D., opined the child's impairments do not meet or medically equal any listing[.]  A

more detailed discussion of the matter will be explained in finding #5."  AR 28-29.  But nowhere in

her decision did the ALJ reference or discuss listing 112.05.  At first blush, this appears to be error.

---

[6]  This unpublished decision is citable under Rule 32.1 of the Federal Rules of Appellate Procedure.
*See also* 9th Cir. R. 36–3(b).

*See Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001) ("An ALJ must evaluate the relevant evidence before concluding that a claimant's impairments do not meet or equal a listed impairment. A boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not do so.") (citation omitted). But a thorough review of the ALJ's decision shows otherwise.

Listing 12.05 states in relevant part:

> Intellectual Disability: Characterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning. The required level of severity for this disorder is met when the requirements in A, B, C, D, E, or F are satisfied.

> D. A *valid* verbal, performance, or *full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function*[.]

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 112.05(D) (emphasis added). Importantly:

> IQ test results must also be sufficiently current for accurate assessment under 112.05. . . . *IQ test results obtained between ages 7 and 16 should be considered current* for 4 years when the tested IQ is less than 40, and *for 2 years when the IQ is 40 or above. IQ test results obtained before age 7 are current for* 2 years if the tested IQ is less than 40 and *1 year if at 40 or above*.

*Id*. at § 112.00(D)(10) (emphasis added).

Applying section 112.00(D)(10), the full IQ score of 65 was current as it was obtained at age fourteen and in the same month R.P. appeared before the ALJ—September 2013. But a current IQ score does not make it valid. Here, the ALJ gave very little weight to the September 2013 psychological evaluation because R.P.'s "school records showed [he] was cooperative, well behaved, and completed the tasks[.]" AR 33. *See Lewis*, 236 F.3d at 513 (noting the ALJ's failure to make findings associated with the epilepsy listing "might have required reversal or remand . . . were it not for the ALJ's findings that [the] seizures were largely a result of noncompliance with [the] prescribed therapy"). And R.P. does not dispute the ALJ's reasoning. Without a "full scale IQ score of 60 through 70," he cannot show that listing 112.05 was met.

14

3.   Credibility Assessment

Finally, R.P. avers "[t]he ALJ's adverse credibility determination is not supported by substantial evidence" with regard to R.P. and Ms. Padilla's statements about his symptoms.  The Commissioner contends the ALJ properly found R.P.'s testimony not fully credible given his range of activities and inconsistent statements, and gave germane reasons for discounting Ms. Padilla's testimony.[7]

a.   *R.P.'s Testimony*

It is settled that a claimant's statement of symptoms, including pain, without more, is not conclusive evidence of disability.  § 416.929(a).  Rather, "[a]n ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible.  First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."  *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quotations omitted).  "If the claimant satisfies the first step of this analysis, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so."  *Id.* at 1014-15.  "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints."  *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015) (quotations and citation

---

[7]   The Commissioner cited to Social Security Ruling 96-7p, which was superseded by Ruling 16-3p, effective March 28, 2016.  *See* 2016 WL 1020935 (March 16, 2016) *and* 2016 WL 1131509 (March 24, 2016).  With Ruling 16-3p, the SSA stated it would no longer use the term *credibility* when evaluating the intensity, persistence and limiting effects of a claimant's symptoms.  2016 WL 1020935, at *14167.  To date, however, only the Seventh Circuit has issued a published opinion, applying Ruling 16-3p retroactively.  *See Cole v. Colvin*, 831 F.3d 411 (7th Cir. 2016).  But even if the Court were to apply Ruling 16-3p retroactively, the ALJ's error here still rings true as R.P.'s symptom evaluation remains unchanged.   Ruling 16-3p implemented a change of diction rather than substance.  *See Mendenhall v. Colvin*, 2016 WL 4250214, at *3 (C.D. Ill. Aug. 10, 2016) (No. 3:14-CV-3389) ("SSR 96-7p and SSR 16-3p are substantially similar.  Rule 16-3p affects only the second step of the method by which symptoms are evaluated.)

1   omitted).  "He must either accept [claimant's] testimony or make specific findings rejecting it."

2   *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993) (internal quotations and citation omitted).

3       Because no evidence suggested malingering, the ALJ was required to provide clear and

4   convincing reasons for finding R.P. not entirely credible.  After recounting R.P.'s testimony about

5   his interest in sports, the activities he engaged in with his friends and siblings, and his need for

6   assistance with personal hygiene, the ALJ stated, "[t]he child's credibility is further diminished

7   because he testified that he did not know the name of the school or grade currently attending, but

8   later testified that he is in independent study at home."  The ALJ then noted, "he is currently learning

9   to play golf and piano."  AR 33.

10

11      In sum, the ALJ mostly regurgitated R.P.'s testimony.  But a recount of his testimony,

12  without more, does not inform the parties or the Court why the ALJ found them not entirely credible.

13  To the extent she found R.P.'s testimony not credible, the ALJ did not identify "what evidence

14  undermine[d]" them.  *See Brown-Hunter*, 806 F.3d at 493.[8]  And to the extent she found R.P.'s

15  testimony not entirely credible because he admitted to being in independent study after earlier stating

16  he did not know his grade level or the school he attended, the Court finds the explanation

17  unconvincing.  First, these statements do not concern the intensity, persistence and limiting effects of

18  R.P.'s symptoms.  Second, that a teenager who the ALJ found suffered developmental language

19  delay and autism spectrum disorder did not know his grade level and school name, yet knew that he

20  was had independent study is not dispositive of a lack of credibility.  To conclude that the ALJ's

21  reasons were "specific, clear and convincing" would therefore be an exaggeration.  The ALJ

22  committed legal error in "fail[ing] to specify . . . her reasons for finding [R.P.'s] testimony not

23

24

25  _____

26  [8]  Even where some evidence is identified, a lack of analysis would still render an ALJ's credibility
    findings deficient.  *See*, *e.g.*, *Brown-Hunter*, 806 F.3d at 494 (noting the ALJ "simply stated her non-
27  credibility conclusion and then summarized the medical evidence supporting her RFC
    determination" and concluding, "[t]his is not the sort of explanation or the kind of 'specific reasons'
28  we must have . . . to review the ALJ's decision meaningfully, [and] ensure that the claimant's
    testimony was not arbitrarily discredited").

credible," such that the Court  cannot "review those reasons meaningfully without improperly

"substitut[ing] our conclusions for the ALJ's, or speculat[ing] as to the grounds for the ALJ's

conclusions." *Id*. at 492 (internal quotations and citation omitted).  And such error is not harmless

because the Court "can affirm the agency's decision to deny benefits only on the grounds invoked by

the agency." *Id.* (citation omitted).

           b.   *Ms. Padilla's Testimony*

An ALJ "will always consider the medical opinions in [a claimant's] case record together

with *the rest of the relevant evidence*[.]"  § 416.927(b) (emphasis added); *see* SSR 06-03p, 2006 WL

2329939, at*2  (Aug. 9, 2006) ("we consider all relevant evidence in the case record when we make

a determination or decision about whether the individual is disabled") *and Molina v. Astrue*, 674

F.3d 1104, 1114 (9th Cir. 2012) ("Lay testimony as to a claimant's symptoms or how an impairment

affects the claimant's ability to work is competent evidence that the ALJ must take into account.")

(citations omitted).  The Ninth Circuit has held that "competent lay witness testimony *cannot* be

disregarded without comment, [citation] and that in order to discount competent lay witness

testimony, the ALJ must give reasons that are germane to each witness[.]"  *Molina*, 674 F.3d at

1114.

As R.P.'s mother, Ms. Padilla testified about his struggles with schoolwork, personal care,

and the ability to express himself.  She also testified about his interests and social and extracurricular

activities.  The ALJ declined to give significant weight to Ms. Padilla's testimony, but did so with

reason.  Specifically, the ALJ discussed Ms. Padilla's lack of medical training, noted she could not

be a disinterested party, and found that her testimony was inconsistent with the preponderance of the

opinions and observations by physicians in this case.  AR 33-34.  The ALJ reasoned: "For example,

medication control[led] the asthma symptoms and intelligence tests were generally in the borderline

intellectual range.  Additionally, school records showed he was helpful to other students, compliant,

knew what was expected of him, understood classroom and school rules, and completed and turned in assignments[.]"

The ALJ could reasonably infer, as she did, that being R.P.'s mother, Ms. Padilla's testimony was "colored by affection for [him] and a natural tendency to agree with the symptoms and limitations [he[ alleges." And the finding that Ms. Padilla's testimony was inconsistent with the objective medical evidence was supported by substantial evidence. *See* SSR 06-03p, 2006 WL 2329939, at*6 ("In considering evidence from non-medical sources who have not seen the individual in a professional capacity . . . it would be appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence[.]") (internal quotations omitted). The ALJ therefore did not disregard Ms. Padilla's testimony without comment.

III.    REMAND

"We have discretion to remand for further proceedings or to award benefits. If additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded. Where the Secretary is in a better position than this court to evaluate the evidence, remand is appropriate." *Marcia v. Sullivan*, 900 F.2d 172, 176 (9th Cir. 1990) (citations and quotations omitted). Under the circumstances, the Court finds remand appropriate so that the ALJ may take the steps necessary to comply with the relevant Federal Regulations, Statutes, Social Security and Acquiescence Ruling and case law. *See Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015) ("For highly fact-intensive individualized determinations like a claimant's entitlement to disability benefits, Congress places a premium upon agency expertise, and, for the sake of uniformity, it is usually better to minimize the opportunity for reviewing courts to substitute their discretion for that of the agency.") (quotations omitted). The ALJ is therefore directed to take reasonable efforts to obtain a comprehensive evaluation of R.P.'s case by a qualified pediatrician or other physician who specializes in a field of medicine appropriate to the R.P.'s disabilities, and to make a proper credibility analysis with regard to his testimony.

IV.    CONCLUSION

Accordingly, the Court GRANTS Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. This action is REMANDED to the Commissioner for further administrative proceedings consistent with this opinion.  The Clerk of Court shall enter judgment in favor of Plaintiff, R.P., by and through his guardian ad litem, Gemma Padilla, and against the Commissioner of Social Security.

IT IS SO ORDERED.

Dated:    __December 2, 2016__                    _____**/s/ Sandra M. Snyder**
                                                                            UNITED STATES MAGISTRATE JUDGE